[Cite as *Choi v. Choi*, 2018-Ohio-725.]

STATE OF OHIO          )          IN THE COURT OF APPEALS
                       )ss:       NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT       )

MIEHYUN CLAIRE CHOI                      C.A. No.     28568

    Appellee

    v.                                   APPEAL FROM JUDGMENT
                                         ENTERED IN THE
PETER CHOI                               COURT OF COMMON PLEAS
                                         COUNTY OF SUMMIT, OHIO
    Appellant                            CASE No.     DR-2015-10-2939

DECISION AND JOURNAL ENTRY

Dated: February 28, 2018

 

CALLAHAN, Judge.

{¶1}     Appellant, Peter Choi ("Husband"), appeals the judgment of the Summit County Common Pleas Court, Domestic Relations Division. For the reasons set forth below, this Court affirms.

I.

{¶2}     Husband and Appellee, Miehyun Claire Choi ("Wife"), were married in 1978. They have three adult children as a result of the marriage. Husband is a licensed dentist. However, due to his age, 64 years, and declining health, he is unemployed. Wife is 62 years of age and works as a nurse anesthetist. During their 38 years of marriage, the parties acquired a marital home, numerous automobiles, significant retirement assets, and funds in savings and checking accounts.

{¶3}     In October 2015, Wife filed for divorce, and Husband counterclaimed for the same. The parties litigated several issues at the final divorce hearing, including spousal support

and division of marital property. At the divorce hearing, Husband alleged Wife voluntarily reduced her income and improperly disposed of marital assets. Wife alleged Husband violated the trial court's order regarding listing the marital home for sale and refraining from making disparaging comments about Wife.

{¶4} The trial court issued a Judgment Entry Decree of Divorce, thereby terminating the marriage. Relevant to this appeal, the divorce decree ordered Wife to pay spousal support of $2,100.00 per month for 5 years. As to the marital property, the retirement accounts were divided equally, while the savings accounts, checking accounts, automobiles, and health saving account remained with the respective owner.

{¶5} Both Husband and Wife timely appealed. Wife filed a Civ.R. 60(A) motion and motion for limited remand. Upon remand, the trial court granted Wife's Civ.R. 60(A) motion and issued a nunc pro tunc Judgment Entry which corrected Wife's maiden name and the grounds upon which the spousal support shall terminate. In light of the nunc pro tunc Judgment Entry, Wife moved and was granted a dismissal of her appeal. Only Husband's appeal remains, with two assignments of error before this Court for consideration.

II.

**ASSIGNMENT OF ERROR NO. 1**

THE TRIAL COURT ERRED IN ITS FEBRUARY 9, 2017 JUDGMENT ENTRY DECREE OF DIVORCE WHEN IT ORDER[ED] SPOUSAL SUPPORT IN THE AMOUNT OF $2,100.00 PER MONTH BY FAILING TO CONSIDER [WIFE'S] VOLUNTARY REDUCTION OF EMPLOYMENT AND FINANCIAL MISCONDUCT.

{¶6} In his first assignment of error, Husband argues that the trial court failed to consider Wife's voluntary reduction of employment and financial misconduct when determining the spousal support award. This Court disagrees.

**{¶7}** Initially, this Court notes that Husband did not identify what actions constituted Wife's "financial misconduct" and this Court will not presume that "financial misconduct" and "voluntary reduction of employment" are one and the same. *See* App.R. 16(A)(7). Nor did Husband develop any argument regarding Wife's financial misconduct relative to the spousal support award. *See id.* Because Husband failed to make any argument in support of this issue, this Court declines to create one for him. *Cardone v. Cardone*, 9th Dist. Summit Nos. 18349, 18673, 1998 Ohio App. LEXIS 2028, *22 (May 6, 1998). ("If an argument exists that can support this assignment of error, it is not this court's duty to root it out."). Accordingly, this Court confines its review to Husband's argument regarding Wife's voluntary underemployment in relation to the spousal support award.

**{¶8}** "In divorce * * * proceedings, * * * the court of common pleas may award reasonable spousal support to either party." R.C. 3105.18(B). A trial court's decision regarding an award of spousal support is reviewed for an abuse of discretion. *Hirt v. Hirt*, 9th Dist. Medina No. 03CA0110-M, 2004-Ohio-4318, ¶ 8. "A trial court will be found to have abused its discretion when its decision is contrary to law, unreasonable, not supported by evidence, or grossly unsound." (Citations and quotations marks omitted.) *Tustin v. Tustin*, 9th Dist. Summit No. 27164, 2015-Ohio-3454, ¶ 21.

**{¶9}** "In determining whether spousal support is appropriate and reasonable, and in determining the nature, amount, * * * of spousal support * * *, the court shall consider all of the * * * factors" listed in R.C. 3105.18(C)(1)(a)-(n). R.C. 3105.18(C)(1). Those factors are as follows:

(a) The income of the parties, from all sources * * *;

(b) The relative earning abilities of the parties;

(c) The ages and the physical, mental, and emotional conditions of the parties;

(d) The retirement benefits of the parties;

(e) The duration of the marriage;

(f) The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;

(g) The standard of living of the parties established during the marriage;

(h) The relative extent of education of the parties;

(i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;

(j) The contribution of each party to the education, training, or earning ability of the other party * * *;

(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;

(l) The tax consequences, for each party, of an award of spousal support;

(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;

(n) Any other factor that the court expressly finds to be relevant and equitable.

R.C. 3105.18(C)(1)(a)-(n). While the trial court's consideration of each of these factors is mandatory, "[t]he trial court is not required to comment on each statutory factor; rather, the record must only show that the court considered the statutory factors when making its award." *Manos v. Manos*, 9th Dist. Summit No. 27335, 2015-Ohio-2932, ¶ 13; *see* R.C. 3105.18(C)(1).

{¶10} Based on R.C. 3105.18(C)(1)(n), Husband argues that the trial court failed to determine that Wife "'voluntar[il]y' reduced her income" and should have her "income * * * imputed at $158,871." Husband relied entirely on this Court's decision in *Collins v. Collins*, 9th

Dist. Wayne No. 10CA0004, 2011-Ohio-2087. *Collins* stated "R.C. 3105.18 does not specifically direct the court to examine financial misconduct or whether a party's conduct evidences intent to avoid payment of spousal support." *Id.* at ¶ 21. However, under R.C. 3105.18(C)(1)(n), "if the court determines that such evidence is relevant and equitable in its determination of spousal support, [then] it has discretion to consider it." *Id.* An example of relevant and equitable facts that a trial court could consider is "one spouse's decision to leave his or her secure and lucrative employment." *Id.*

**{¶11}** In *Collins*, the husband filed for divorce and resigned his position as a physician at a hospital earning $200,000 annually in order to open a private medical practice earning $29,400 annually. *Id.* at ¶ 3, 5. The trial court implicitly found the husband to be voluntarily underemployed and imputed $100,000 to him as income for child and spousal support. *Id.* at ¶ 33-34. Both the magistrate and trial court found the husband did not have an ulterior motive of avoiding support obligations when he resigned from the hospital to begin his private practice. *Id.* at ¶ 41-42. Because the trial court did not provide any other analysis of the evidence and the statutory factors, this Court was concerned that the husband's lack of "ulterior motives in leaving his employment was the paramount consideration in determining spousal support." *Id.* at ¶ 46. This Court stated "[w]hether [the husband] had ulterior motives or not, his unilateral decision to leave his secure and lucrative employment, was certainly both relevant and raised equitable concerns as contemplated by R.C. 3105.18(C)(1)(n)." *Id.* at ¶ 46. Based on various errors, the case was remanded. *Id.* at ¶ 38, 45-46.

**{¶12}** This case is factually and legally distinguishable from *Collins*. The trial court stated it reviewed the R.C. 3105.18(C)(1) factors in light of the testimony and exhibits. This evidence included Wife's testimony that she was 62 years old and worked as a nurse anesthetist.

Wife testified that her employer changed in 2015 because the original employer was purchased by another company. In September 2015, her new employer learned that a significant contract would not be renewed effective January 1, 2016. Due to the loss of this contract, the employer had to "cut back staff through retirements and layoffs [and t]he remaining staffs['] hours were reduced, * * * in an effort to control costs." Wife testified that in a meeting with the chairman, he "asked [them] to voluntarily either take an early retirement or take like hours cut because * * * otherwise there was going to be serious layoffs." Because she needed to continue working, Wife elected the hourly reduction, in lieu of retirement and to avoid being laid off. She limited the reduction to an 8-hour shift per week because she knew that she "could [not] afford to cut back any more," whereas other staff reduced their hours from 40 to 26 hours a week. Despite the early retirements and hourly reductions, 11 nurse anesthetists were terminated. Fortunately, Wife was not one of them. Unlike the spouse in *Collins*, Wife did not quit a secure and lucrative job. Instead, she took a limited reduction in hours in hopes of keeping her job.

{¶13} Husband argues that the employer described the decision of Wife to take an hourly reduction as being "'entirely voluntarily.'" While Husband states that the "employer['s] statements" evidencing that "the reduction in hours were 'entirely voluntarily'" "were admitted into the [c]ourt proceeding," Husband has failed to cite to the record location of these "employer statements." An appellant bears the burden of not only formulating an argument on appeal and supporting that argument with legal authority, but also "*with citations to * * * parts of the record on which the appellant relies*." (Emphasis added.) App.R. 16(A)(7). Further, the transcript of the hearing reflects Wife's counsel objecting to this line of questioning and a sidebar being held. After the sidebar, there were no further questions on the issue and Wife did not answer those

questions. Thus, there was no such evidence at the hearing and this portion of Husband's argument is not supported by the record.

{¶14} On the contrary, Wife testified to and admitted an exhibit of an email from the employer which clarified that it was the impetus of that decision. The employer required Wife to choose early retirement, reduction in hours, or a layoff. Wife's decision was made at the employer's demand, and not on her own initiative. Again, unlike the spouse in *Collins*, Wife's decision to reduce her income by 8 hours a week was not voluntary, uncoerced, or unilateral.

{¶15} Another distinguishing factor between this case and *Collins* is found in the findings of the trial courts. The trial court in the case before us considered "all of the statutory factors * * * as made relevant by the evidence" and in light of the evidence, did not "expressly find[]" any other factors relevant or equitable in its consideration of spousal support. (Emphasis deleted.) *See contra Collins* at ¶ 46; R.C. 3105.18(C)(1)(n). Accordingly, Husband's position that the facts and issues in *Collins* are akin to this case is incorrect.

{¶16} In light of the foregoing, Husband failed to present evidence that Wife's weekly 8-hour reduction in employment constituted her being "'voluntarily under employed.'" Accordingly, the trial court was not required to consider whether Wife was "'voluntarily under employed'" when deciding the spousal support award. *See Johnson v. Johnson*, 9th Dist. Summit No. 24159, 2008-Ohio-4557, ¶ 18 (This Court recognized that while the trial court is not prohibited from considering voluntary underemployment for purposes of spousal support, such consideration is unwarranted when there is no such evidence.). *See also Valentine v. Valentine*, 9th Dist. Medina No. 11CA0088-M, 2012-Ohio-4202, ¶ 4-5 (When considering spousal support, a trial "court did not *have to specifically consider* whether [the spouse] was voluntarily unemployed * * *.") (Emphasis added.).

{¶17} Lastly, Husband's position that the trial court should impute $158,871 in income to Wife to determine spousal support is not supported by the law. Relying on *Collins*, this Court has consistently held that the spousal support statute, unlike the child support statute, does not direct the trial court to "'impute'" income to a spouse. *Collins* at ¶ 19; *Valentine* at ¶ 4-5; *Kokoski v. Kokoski*, 9th Dist. Lorain No. 12CA010202, 2013-Ohio-3567, ¶ 19, 21.

{¶18} Based on the forgoing, the trial court did not abuse its discretion when it declined to consider whether Wife was voluntarily underemployed and it did not impute income to Wife.

{¶19} Husband's first assignment of error is overruled.

## ASSIGNMENT OF ERROR NO. 2

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT FAILED TO EQUITABLY DIVIDE THE MARITAL PROPERTY IN ITS FEBRUARY 9, 2017 JUDGMENT ENTRY DECREE OF DIVORCE WHEN IT FAILED TO CONSIDER [WIFE'S] DEPLETION OF [THE] MARITAL ASSETS IMMEDIATELY PRIOR TO THE DIVORCE.

{¶20} In his second assignment of error, Husband argues that the trial court failed to consider Wife's financial misconduct, resulting in an inequitable division of marital property. This Court disagrees.

{¶21} "A trial court is vested with broad discretion when fashioning a division of marital property." *Naylor v. Naylor*, 9th Dist. Summit Nos. 21758, 21881, 2004-Ohio-4452, ¶ 16. Additionally, the trial court's determination regarding whether one spouse has engaged in financial misconduct is reviewed for an abuse of discretion. *See Havrilla v. Havrilla*, 9th Dist. Summit No. 27064, 2014-Ohio-2747, ¶ 46. Pertinent to this Court's review of this assignment of error, the abuse of discretion standard is set forth under the first assignment of error.

{¶22} R.C. 3105.171(F)(1)-(10) sets forth the factors the trial court shall consider when making a division of marital property. Another consideration in the division of marital property

is financial misconduct by a spouse. *See* R.C. 3105.171(E)(4). When a spouse engages in financial misconduct, the statute provides the trial court with discretion to "compensate the offended spouse with a distributive award or with a greater award of marital property." R.C. 3105.171(E)(4); *Kita v. Kita*, 9th Dist. Summit No. 19256, 1999 Ohio App. LEXIS 5545, *5 (Nov. 24, 1999).

**{¶23}** R.C. 3105.171(E)(4) defines financial misconduct as including "the dissipation, destruction, concealment, nondisclosure, or fraudulent disposition of assets." As applied to the division of marital property, "financial misconduct necessarily implicates wrongdoing such as one spouse's [intentional] interference with the other's property rights or the offending spouse's profiting from the misconduct." *Tustin*, 2015-Ohio-3454, at ¶ 44; *Hammond v. Brown*, 8th Dist. Cuyahoga No. 67268, 1995 Ohio App. LEXIS 3975, *9 (Sept. 14, 1995). Thus, "[f]inancial misconduct requires more than dishonest behavior." *Bucalo v. Bucalo*, 9th Dist. Medina No. 05CA0011-M, 2005-Ohio-6319, ¶ 30. It also "requires 'some element of wrongful intent or scienter[.]'" *Havrilla* at ¶ 47, quoting *Orwick v. Orwick*, 7th Dist. Jefferson No. 04 JE 14, 2005-Ohio-5055, ¶ 25.

**{¶24}** Wrongful scienter may be established based on when the alleged financial misconduct occurred in relation to the filing and pendency of the divorce or period of separation. *Downey v. Downey*, 9th Dist. Summit No. 23687, 2007-Ohio-6294, ¶ 17; *Hammond* at *9-10. "[I]f the time frame of the alleged misconduct does not establish scienter, there must be some other evidence that does establish it." *Orwick* at ¶ 28 (If the alleged financial misconduct occurred years prior to the initiation of the divorce proceedings, then there must be proof of wrongful intent when the misconduct occurred.).

**{¶25}** The burden of proving financial misconduct rests with the complaining spouse. *Palazzo v. Palazzo*, 9th Dist. Summit Nos. 27932, 27935, 2016-Ohio-3041, ¶ 10. "An allegation of financial misconduct, unsupported by evidence of wrongdoing, will not support a dissipation award." *Detlef v. Detlef*, 6th Dist. Lucas No. L-00-1137, 2001 Ohio App. LEXIS 5597, *15 (Dec. 14, 2001).

**{¶26}** Husband contends that immediately prior to filing for divorce, Wife withdrew large sums of money from the marital accounts which she used to purchase a car, make questionable charitable donations, pay down her personal credit card, and make gifts to their adult children in order to "deceptively deprive[ Husband] of an equal division of what actually were the marital assets." Husband also asserts that "$160,000.00 from two (2) CD[s ] are un[ac]counted for."

**Car**

**{¶27}** Husband and Wife both testified regarding the following vehicles that they owned at the time of the divorce: a Lexus, a 1996 Mazda Miata, a 2003 Acura MDX, a 1997 Acura RL, a 2008 Mercedes, a 2004 Volvo, and a 2016 Subaru Forester. All of the cars, except for the Subaru, were in Husband's name. However, both parties testified that the Volvo belonged to their oldest son and the Miata belonged to their youngest son.

**{¶28}** After the divorce was filed, Husband testified that he "junked" the Lexus for "$180," sold the 1997 Acura RL for $500 because it was "broken and  * * * undrivable," and shipped the Miata to their youngest son in California. As to the Volvo, Husband admitted a repair bill and testified that the car required $1,317 in engine repairs and that their oldest son primarily drove it. Additionally, both parties testified that the Acura MDX had ongoing

transmission problems and only operated in fourth gear. There was no testimony as to the condition of the Mercedes except its Kelley Blue Book Value.

{¶29} Wife testified that Husband "told [her] to drive whatever car for that day or that week he thought [she] should drive." She drove the Acura MDX until the transmission began to fail for the third time, which was a couple of months before the divorce. According to Wife, because there was something wrong with the Acura MDX, Husband "told" her to drive the Miata. Wife testified that she did not like to the drive the Miata because it was "very slippery" "in the winter." Also, the Miata was the youngest son's car.

{¶30} At the hearing, Wife stated that all of Husband's cars needed repairs and he told her that "those cars are not in great condition." With the exception of the Miata, Wife "did not feel unsafe. It was that [Husband] always told [her] they were unsafe to drive. So[, she] took his word for it."

{¶31} Because Wife's commutes to work varied and she needed a safe car, she purchased the Subaru. She chose the Subaru because her "good friend had bought that car a year before and [her friend's] husband had done a lot of research on the safest car" before making the purchase.

{¶32} Wife purchased the Subaru for $28,484, in cash, approximately one week before filing the divorce. Wife testified that during their marriage she had purchased three other vehicles in cash: the Volvo, the Miata, and a conversion van.

{¶33} Based on the foregoing, Husband failed to present any evidence of wrongdoing by Wife when she purchased the Subaru. Wife's purpose in buying the Subaru a week before the divorce filing was to insure that she had a safe car, which Husband was unable to provide. Accordingly, the timing of the purchase does not establish wrongful scienter by the Wife.

Moreover, the purchase of a safe vehicle to use for her commute to work did not result in a profit to Wife. Further, the purchase of the Subaru was made in cash from her savings account, just as she had done for three other vehicles during the marriage. Thus, there was no evidence Wife was intentionally interfering with Husband's rights to the marital property.

**Charitable Contributions**

**{¶34}** Husband challenges Wife's charitable donations in 2012 and contends that "[t]he evidence elicited during trial shows that [Wife] made improper donations to an individual evidenced by d[ia]ries that she had a relationship outside the church affiliation." Contrary to Husband's statement, no such evidence is in the record. The hearing reflects that the trial court repeatedly sustained Wife's objections to the admission of her diaries and questioning as to her charitable donations being influenced by an alleged recent paramour.

**{¶35}** Instead, there is evidence that Wife took an $8,000 charitable donation deduction on her 2012 taxes. Additionally, there is a statement of giving from Westminster Presbyterian Church dated for 2012 which reflects Wife giving $4,660 to the church throughout the year. At the hearing, Husband argued that Wife failed to prove where the remaining $3,340 was donated and thus infers Wife engaged in misconduct. However, Wife testified that she "also contributed to [her] friend's church, the Catholic church, [and she's] a member at a Lutheran church" to explain where the remaining contributions were made.

**{¶36}** In response to why she gave $4,600 to Westminster Presbyterian Church, Wife explained that "[i]t's just the church that [she] grew up in and that [she] had a membership in." She dispelled the notion that she was giving money to Westminster Presbyterian Church based on romantic reasons by pointing out that the youth pastor with whom she went on three dates in 1976 left that church the same year. Thus, the evidence reflected her donations were influenced

by her past membership at the church and not a short-lived relationship with a youth pastor who left the church 36 years ago.

{¶37}  Wife also testified that she donates "very generously to church[es]" because she "feel[s] like God has given [her] a lot and that's just [her] way of giving back to God. And * * * because * * * the [B]ible says [she] should tithe and that's [her] conviction."  She confirmed that she did not make charitable donations to hide her money from Husband.  In fact, Husband was aware of her charitable giving because he told her to "pay [her] church offering with [her own] income." Wife's tax returns from 2012 through 2015 reflected a consistent five to seven percent charitable donation each year.

{¶38}  Again, Husband has failed to present evidence of wrongdoing by Wife as it relates to her charitable donations in 2012 to Westminster Presbyterian Church. The conduct Husband complains of was 3 years prior to and not immediately preceding the divorce.  There was no evidence that Wife profited from the charitable donation.  Instead, the evidence was that Wife made the donations based on her desire to help others and the directives of the Bible. Nor was there any evidence that Wife intended to dissipate Husband's share of the marital estate.  In fact, Husband was aware of Wife's charitable giving and told her to do so with her own income.

### Money Given to Adult Children

{¶39}  The parties' three children attended Harvard for their undergraduate education. As agreed by Wife and Husband, Wife paid for all of their daughter's tuition, they split the cost of the tuition for their youngest son, while their oldest son paid for his own tuition.  Husband testified that he paid for everything else related to the children, such as their travel to school.  He stated that Wife kept all her money in her account and did not pay for anything. Eventually, he

conceded that Wife "paid [for] some of them later on" and that she bought the Miata for their youngest son.

{¶40} Wife testified more specifically that out of her bank account she paid for all three of the children's "[b]ooks, clothes, living pocket money," "room and board," "travel back and forth" for the holidays, and their credit card bills. While the children were in college and after they graduated, Wife would also deposit money into their individual bank accounts. For instance, in 2012 Wife deposited $1,500 and $10,000 into the youngest son's account. And she deposited $20,000 into the oldest son's account in 2011 and again in 2012. The second deposit was to pay for his half of the cost of his wedding.

{¶41} On appeal Husband does not challenge these payments to the children. He only contests the payments Wife made in August and September 2015 to the children. Wife testified that she paid their daughter $4,000 on August 8, 2015 as reimbursement for her portion of the meals, hotel, and travel costs associated with a trip to Vancouver with their daughter and son-in-law. Additionally, Wife gave their youngest son $2,000 on September 4, 2015 to help him with the cost of his medicine related to a recent illness. Lastly, Wife issued two checks to their oldest son on September 19, 2015–one in the amount of $5,000 as an anniversary gift and one in the amount of $1,000 as a birthday gift.

{¶42} While all of these payments occurred shortly before the divorce filing, there is no evidence that Wife acted with a wrongful intent in issuing these payments. The moneys were paid to their adult children. Contrary to Husband's bald assertions that Wife only paid tuition, the checks from 2011 and 2012 established that Wife had historically given large sums of money to their adult children for various reasons. Husband did not contest Wife's expenditures to their children in the past. Thus, her continued support of their children a month prior to the divorce

filings is not evidence of an intentional interference with Husband's rights to the marital property. Nor is there evidence that Wife gained or profited from these expenditures.

**Credit Card Payment**

**{¶43}** Wife testified and her bank statement reflected that she made a payment of $3,120.79 to American Express for her credit card on September 9, 2015. Husband did not elicit any other testimony from Wife regarding this credit card payment. Husband argues that the proximity of the credit card payment to the filing of the divorce establishes Wife's wrongful scienter. While this was a significant payment in the month preceding the divorce filing, Husband admitted other evidence which established this single payment was not made with wrongful scienter.

**{¶44}** Husband admitted Wife's Affidavit of Property in which she responded that "[a]ll credit cards" were "[p]aid monthly" and there was no balance due. Additionally, Wife testified that she does not have any credit card debt. Further, Husband admitted Wife's bank statements from September 1, 2015 through July 31, 2016. A review of these bank statements reflects that Wife routinely made a monthly payment to American Express during the first half of each month in amounts ranging from $1,950 to $5,065.[1] This payment history, along with Wife's averment in the Affidavit of Property that she has no outstanding debt because it is paid monthly, shows Wife's lack of wrongful scienter as to the single American Express credit card payment in September 2015.

---

[1] Husband does not argue that payments subsequent to the divorce filing were financial misconduct.

**Certificates of Deposit**

**{¶45}** Wife testified that in 2008 she did not renew her certificates of deposit ("CDs") from 2005 and 2006 and instead rolled the CDs' proceeds of $108,932 into her money market account. These transactions were reflected on her September 2008 bank statement. Husband does not dispute this chain of events. Instead, he argues that Wife engaged in financial misconduct because she has not accounted for what happened to the monies from the CDs from 2008 to the present. Husband has "calculated there's about at least one million dollar[s] gone somewhere" and he does not know "where it ended up."

**{¶46}** In response, Wife testified that she does not have any CDs currently. As to the funds from the earlier CDs, she stated that the money was transferred into her money market account and she "used it for tuition, for the living expenses for [her] children, [and] all the bills." The youngest child graduated from college in 2011. As addressed above, there were checks made payable to the children dating back to 2011. Wife stated that none of the proceeds from the CDs is missing or hidden. Wife testified that she has only ever had one bank account and that all her money is in that account because she is "not very financially savvy."

**{¶47}** In this case, Husband is complaining of alleged misconduct dating back 7 years. He has failed to present anything other than bald accusations that Wife wrongfully disposed of the proceeds from the CDs. There is no evidence that Wife personally profited or engaged in misconduct solely to defeat Husband's interest in the marital estate. Instead, the evidence is that the proceeds of the CDs were used to the benefit of their children and to pay bills.

**Conclusion**

**{¶48}** The trial court made no finding on the issue of financial misconduct and did not mention the issue in the final judgment. This is because Husband's evidence did not support

consideration of the issue of financial misconduct. Accordingly, the trial court did not abuse its discretion in fashioning an equitable division of the marital property.

**{¶49}** Husband's second assignment of error is overruled.

III.

**{¶50}** Husband's first and second assignments of error are overruled. The judgment of the Summit County Common Pleas Court, Domestic Relations Division is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

LYNNE S. CALLAHAN
FOR THE COURT

HENSAL, P. J.
SCHAFER, J.
CONCUR.


APPEARANCES:

THOMAS T. MULLEN, Attorney at Law, for Appellant.

RANDAL A. LOWRY, Attorney at Law, for Appellee.

KENNETH L. GIBSON, Attorney at Law, for Appellee.