[Cite as *Sullinger v. Sullinger*, 2019-Ohio-1489.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

Douglas A. Sullinger                                        Court of Appeals No. L-18-1079

    Appellant                                              Trial Court No. DR2015-0204

v.

Carol F. Sullinger

    Appellee

and

Vendita Technology Group, Inc., etc.            **DECISION AND JUDGMENT**

    Defendant                                               Decided:  April 19, 2019

* * * * *

Erik G. Chappell and Amy M. Waskowiak, for appellant.

Matthew T. Kemp and Rebecca E. Shope, for appellee.

* * * * *

**MAYLE, P.J.**

{¶ 1} Plaintiff-appellant, Douglas A. Sullinger, appeals the March 23, 2018

judgment of the Lucas County Court of Common Pleas, Domestic Relations Division,

dissolving his marriage to defendant-appellee, Carol F. Sullinger, dividing their property,

determining spousal support, and awarding attorney fees. For the reasons that follow, we affirm, in part, and reverse, in part.

## I. Background

{¶ 2} Douglas Sullinger ("Douglas") and Carol Sullinger ("Carol") were married on October 8, 1994, and had two children together, born in 1998 and 1999. On March 13, 2015, Douglas filed a complaint for divorce. Carol answered and counterclaimed.

## A. The Vendita Enterprises

{¶ 3} Douglas and Carol acquired significant assets during their marriage, primarily due to the success of their business, Vendita Technological Group, LLC ("VTG, LLC"). VTG, LLC is a reseller of Oracle software products. Carol was the company's CEO and 51 percent owner; Douglas was its Executive Vice-President and 49 percent owner. Douglas was primarily responsible for the company's day-to-day operations. Carol's majority ownership interest allowed VTG, LLC to maintain minority-ownership status with the Women's Business Enterprise National Council ("WBENC"), potentially providing an advantage to the company when doing business with clients that participate in supplier diversity initiatives.

{¶ 4} Douglas was also the president and sole shareholder of a related entity, Vendita Technological Group, Inc. ("VTG, Inc.").[1] VTG, LLC was the profit-generating

---

[1] Douglas was also the sole owner or shareholder of Vendita Management Corp., Vendita Asset Group, LLC, Vendita Services Corp., and Sullinger & Associates, LLC.

2.

arm of the business and the entity through which distributions were made; VTG, Inc. paid the business's expenses. VTG, LLC reimbursed VTG, Inc. for these expenses by paying it an annual management fee.

## B. The Temporary Orders

{¶ 5} The domestic relations court maintains a standard preliminary injunction applicable when a complaint is filed, prohibiting the parties from "selling, removing, transferring, encumbering, pledging, damaging, hiding, concealing, assigning or disposing of" any property owned by either spouse—including real estate, household goods, vehicles, financial accounts, and personal property—without the prior written consent of the spouse or the court. This standard order was journalized in this case on March 16, 2015.

{¶ 6} On June 10, 2015, the trial court journalized a judgment entry prohibiting the Vendita entities from "[s]elling, removing, transferring, liquidating, withholding, disposing of, or in any manner secreting or dissipating the assets of Carol F. Sullinger or further from diminishing, destroying, damaging or reducing the value of marital or separate property of Defendant Carol F. Sullinger." It entered a second judgment restraining Huntington Bank from:

> Selling, removing, transferring, withholding, disposing, or in any manner secreting the assets of the parties * * *; in either diminishing, destroying, damaging or reducing the value of marital or separate property or assets of the parties * * *; and from in any way withdrawing, spending,

3.

encumbering or disposing of any funds deposited in a bank account, money market, savings account, credit union, stocks, bonds, safe deposit box, or certificates of deposits. * * *

{¶ 7} On June 17, 2015, Douglas and Carol appeared before the court and read the terms of a negotiated temporary consent order into the record, which was eventually reduced to writing and journalized on August 18, 2015 ("the consent order"). It was aimed at maintaining the status quo with respect to the businesses and the parties' assets. It delineated some of the parties' financial obligations and provided for certain payments and distributions.

{¶ 8} Under the order, Douglas would continue the day-to-day operations of Vendita without interference from Carol. The consent order prohibited Douglas and Carol from paying personal expenses, salaries or other compensation, or making shareholder distributions to themselves from the company, except as provided in the order. It also dictated that the Vendita entities "would operate as they have in the past and incur ordinary and necessary business expenses." The consent order explicitly stated that with respect to the Vendita entities, "Douglas will not take any action inconsistent with the continuation of the status quo." And it specifically prohibited him from taking any of the following actions without first obtaining Carol's written consent[2]:

---

[2] The order also prohibited Carol from doing any of these things, however, we focus this discussion on Douglas's obligations under the consent order because his compliance—or lack thereof—became a critical issue in the case.

4.

(1) increasing or decreasing the salary of any employee or agent other than in the ordinary course of business;

(2) materially altering, amending, or modifying any compensation or benefit plan;

(3) selling, offering for sale, leasing, or otherwise transferring ownership of the company's assets;

(4) purchasing assets outside the ordinary course of business;

(5) relocating any asset of the company;

(6) amending, or modifying any contract, commitment, for agreement of the company;

(7) subjecting any assets of the company to any liens, claims, security interests, or encumbrances;

(8) mortgaging, pledging, or otherwise encumbering the assets of the company;

(9) entering into any leases, licenses, assignments, or similar rights or obligations with respect to any property of the company;

(10) authorizing or permitting the company to borrow any money;

(11) changing any of the company's accounting policies or procedures;

(12) guarantying the indebtedness of another person;

(13) loaning any money to any other person;

(14) making any distributions or paying any dividends except as provided in the order;

(15) entering into any transaction with any affiliate of either party;

(16) selling, assigning, gifting, or otherwise transferring any ownership interest in the company;

(17) taking any action to offer the company or any portion of it for sale; or

(18) taking any action that would impair or make it impossible for the company to continue to conduct its business.

{¶ 9} Under the consent order, VTG, Inc. was to pay Douglas a salary of $120,000 per year and VTG, LLC was to pay him a distribution of $200,000 per year, less the sum of his net salary from VTG, Inc., plus any 401(k) contribution made from his gross salary. VTG, LLC was to pay Carol a distribution of $200,000 per year (in monthly installments), less her net salary from her current employer, the University of Toledo, plus any 401(k) contribution made from her University of Toledo gross salary.

{¶ 10} Carol was obligated to pay the expenses of the parties' children and the expenses relating to her Sylvania, Ohio home. She was awarded, and was required to pay expenses associated with, the parties' 2011 Cadillac Escalade, 2006 Lexus, and Dodge Charger.

{¶ 11} Douglas was required to pay the expenses relating to his home in Holland, Ohio, and the parties' vacation homes in Angola, Indiana, and Harrison, Michigan. He

6.

was awarded, and required to pay expenses associated with, a 1970 SS Chevelle, a 2015 Malibu speedboat, a Bennington pontoon boat, and three jet skis.

{¶ 12} Carol was entitled to receive a 2013 federal income tax refund of $237,289, but the order provided that half of the refund would be distributed to Douglas. An additional $135,000 was ordered to be distributed to Carol from a Huntington National Bank money market account, $80,000 of which represented an approximation of Douglas's receipt of the 2013 federal income tax refund, and the remainder of which represented the distribution of marital assets in recognition of Douglas's purchase of a boat.

{¶ 13} The order provided that Vendita Asset Group, LLC would make an additional distribution of $95,000 to Carol from a First Merit account: $25,000 of that was earmarked for their children's education-related expenses for school year 2015 to 2016; $30,000 was for completion of work being performed at the Sylvania, Ohio home; $25,000 was for attorney's fees; and $15,000 was for business valuation and forensic accounting expert fees.

{¶ 14} Both Douglas and Carol were to receive an amount equal to 45 percent of their pro rata share of the allocable taxable income reportable by each of them to be paid by VTG, LLC. This was to allow them to make appropriate quarterly estimated tax payments. The order also provided that VTG, LLC would annually make a true-up distribution to either Carol or Douglas in such amount as was necessary to cause the parties to have received equal distributions.

7.

**{¶ 15}** Carol was required under the order to continue medical, dental, and vision insurance for Douglas and their children through her employer. Douglas was ordered to take all action necessary to negotiate and complete the pending sale of their Harrison Lake property, with one-half of the net proceeds to be paid to each party.

### C. The Judgment Entry of Divorce

**{¶ 16}** The temporary orders remained in effect until March 13, 2018, when, after a five-day trial, the Lucas County Court of Common Pleas, Domestic Relations Division, entered a judgment entry of divorce. The court amended its judgment entry on March 23, 2018.[3]

**{¶ 17}** The March 23, 2018 judgment ordered Douglas to pay spousal support to Carol of $14,000 per month (plus processing charges) and obligated him to pay $87,500 toward Carol's attorney fees. The trial court awarded Douglas all interest in the Vendita enterprises. Carol was granted a distributive award of $699,728, representing half of the value of the company.

**{¶ 18}** Carol was awarded the Sylvania, Ohio home and its contents, the Cadillac and Lexus automobiles, the parties' Highland Meadows Country Club membership, her checking account maintained at Waterford Bank, a joint account maintained with the parties' son at Metamora Bank, a check from State Farm insurance, her Voya 401(k), all

---

[3] Unless stated otherwise, references in this decision to the "judgment" or "judgment entry" are to the March 23, 2018 judgment entry.

8.

but $16,654 of the funds maintained in her American Fund 401(k), and $177,935 and $924 from a Huntington money market account in her name.

{¶ 19} Douglas was awarded the Holland, Ohio home that he purchased after leaving the marital residence, its contents, two jet skis, a Mercedes vehicle, a Ford pickup truck, his checking account, memberships at Sylvania and Stone Oak Country Clubs, his American Fund 401(k), $16,654 from Carol's American Fund 401(k), his interest in acreage located in Hardin County, a 2015 Malibu boat, and the refund from the parties' 2016 marital tax return.

{¶ 20} The court ordered Douglas to sell the parties' pontoon boat, one of three jet skis, a Chevelle automobile, and a golf cart, with the proceeds to be divided equally. Credit card points of 449,150 were divided equally. The proceeds of a restitution claim against the contractor who built their Sylvania, Ohio home were to be divided equally.

{¶ 21} Finally, and of great significance to the present appeal, the trial court found that Douglas was not a credible witness and that he engaged in financial misconduct. It awarded Carol an additional $500,000 for this misconduct.

{¶ 22} To satisfy the amounts owed to Carol, the judgment entry provided that Carol would receive $824,906 from the parties' joint Huntington money market account, which represented her half of the proceeds of the sale of the parties' vacation home in Indiana, and $412,453 as partial payment of the $500,000 financial-misconduct award. Amounts maintained in a Huntington money market account in Douglas's name were to be divided equally, except that an additional $787,274 from Douglas's share was ordered

9.

to be paid to Carol—$699,728 of that amount representing Carol's half of the value of the company, and $87,546 representing the remainder of the $500,000 awarded to Carol for Douglas's financial misconduct. Any remaining balances in the parties' three Huntington money market accounts were to be divided equally. Each party was ordered responsible for his or her respective debts.

{¶ 23} Douglas challenges the trial court's judgment and assigns the following errors for our review:

> **No. 1**: The Trial Court's decision to find financial misconduct on the part of Husband was against the manifest weight of the evidence.
>
> 1. The Trial Court did not establish, according to the proper standard, that the Husband either profited from the purchase of the Mercedes, the revenue recognition change, the distributions, or the move to Tampa or that he intentionally defeated his Wife's distribution of assets.
>
> 2. The Trial Court did not establish, according to the proper standard, that the revenue recognition change that took place prior to the divorce constitutes financial misconduct as a matter of law.
>
> 3. The Trial Court failed to consider all of the testimony regarding the litigation expenses when finding that none of the litigation expenses were for the benefit of the business.

10.

4. The Trial Court failed to consider that each party received $200,000 per year in marital money, and thus the use of that money could not constitute financial misconduct.

**No. 2**: The Trial Court's decision to award either $375,000 or $500,000 as a distributive award was an abuse of discretion.

**No. 3**: The sum awarded by the Trial Court's [sic] for financial misconduct was an abuse of discretion since the amount of the award is required, as a matter of law, to bear some relationship to the facts of the case, the conduct involved or the amount of the items involved.

**No. 4**: The Trial Court's decision to fail to find financial misconduct on the part of the Wife was against the manifest weight of the evidence.

1. The Trial Court improperly ignored the fact that Wife removed Husband from health insurance and did not compensate him for the cost completely.

2. The Trial Court improperly ignored the fact that Wife removed money from the children's accounts and used the money for payment of items that she was required to pay under the Consent Order.

**No. 5**: The Trial Court abused its discretion by failing to distribute the marital money contained in the University of Toledo Federal Credit Union account.

**No. 6**:  The Trial Court abused its discretion when it awarded Wife monthly spousal support of $14, 000.

    1.  The Trial Court improperly "double dipped" when it counted twice a future income stream by counting once in valuing the marital asset and once in deciding the Plaintiff's ability to pay spousal support.

    2.  The Trial Court failed to consider all income of the parties including income from the assets of each party.

    3.  The Trial Court failed to consider all of the liabilities of the parties including tax obligations.

    4.  The Trial Court improperly considered the expenses of the adult children when deciding an appropriate amount of support.

    5.  The Trial Court erred when it failed to terminate the spousal support upon the death of the Plaintiff.

**No. 7**:  The Trial Court abused its discretion when it awarded Wife $87,500 in attorney fees.

## II.  Law and Argument

{¶ 24} Douglas challenges the trial court's finding of financial misconduct and the amount awarded to Carol in connection with this finding; the failure of the court to find that Carol engaged in financial misconduct; the failure of the court to divide amounts maintained by Carol in a credit union account; the amount of the spousal-support award; and the award to Carol of attorney's fees.  We address Douglas's challenges in turn.

12.

## A. Financial Misconduct

{¶ 25} The trial court found that Douglas engaged in financial misconduct and it awarded Carol $500,000 for this misconduct. In his first assignment of error, Douglas claims that the trial court's finding of financial misconduct was against the manifest weight of the evidence. He argues primarily that there was no evidence that he profited from his actions or that he intentionally defeated Carol's distribution of assets.

{¶ 26} Before addressing Douglas's challenges to the financial-misconduct finding, we (1) acknowledge—and summarize—detailed credibility determinations made by the trial court that were adverse to Douglas; and (2) explain the bases for the trial court's financial-misconduct findings.

### 1. The trial court found Carol more credible than Douglas.

{¶ 27} The trial court made detailed credibility determinations before explaining its rationale for its financial-misconduct findings. It specifically found that "[t]he issue of credibility weighs in favor of Wife." The court based its determination on Douglas's gestures and voice inflection, his "selective memory" in being able to recall facts that were helpful to his case, but not those that were not helpful, and his conduct before and after the consent order was entered. It identified four specific instances of conduct demonstrating Douglas's lack of credibility, however, it emphasized that these were merely examples and not an exhaustive list of the conduct underlying its credibility finding.

13.

**{¶ 28}** First, Douglas was present when the parties read into the record the terms of the consent order in June of 2015; nevertheless, Douglas refused to sign the entry memorializing those terms, insisting that he had been coerced into the agreement.

**{¶ 29}** Second, the consent order provided that distributions to the parties would be made through VTG, LLC. But before entering into the consent order, Douglas had already planned to implement an accounting change pursuant to which income once paid to VTG, LLC would instead be paid to Douglas's company, VTG, Inc. This left VTG, LLC in the position of having to borrow money from VTG, Inc. to pay distributions, creating debt for VTG, LLC. The trial court described this as "self-dealing" impacting Douglas's credibility.

**{¶ 30}** Third, Douglas failed to keep the court informed of issues directly bearing on the court's efforts to protect the major marital asset, the Vendita entities. One such issue related to Carol's refusal to cooperate in seeking to renew the company's WBENC certification. Because of the potential economic repercussions of losing its WBENC certification, the trial court entered an order allowing Douglas "to take such means as are necessary, reasonable and proper to obtain WBENC certification for 2016 without [Carol's] participation." This resulted in Douglas acquiring a business called Derby, Inc. and led to his creation of a new Vendita entity, Vendita, LLC—both companies were 51 percent women-owned, with Douglas owning the remaining 49 percent. Douglas neglected to tell the trial court that he had failed in further attempts to secure WBENC and other minority-owned business certifications. The court expressed that it should have

14.

been advised of this given the direct bearing on its efforts to protect the parties' main marital asset.

{¶ 31} Finally, the trial court was skeptical of Douglas's credibility due to his "questionable practice" of running personal expenses through the businesses.

*2.  The court identified three categories of financial misconduct by Douglas.*

{¶ 32} As it did with its credibility findings, the trial court described in detail its rationale for finding that Douglas had committed financial misconduct.  It organized Douglas's misconduct into three categories:  (1) violation of court orders, (2) "VTG, Inc.," and (3) dissipation of marital assets.

*a.  Violation of Court Orders*

{¶ 33} The trial court found that Douglas violated two court orders:  (1) the court's standard injunction, which would have been in place beginning March 13, 2015, when Douglas first filed for divorce, and (2) the consent order.

{¶ 34} The trial court found that Douglas incurred additional debt and disposed of a marital asset in violation of the standard injunction when he purchased a new Ford F-150 truck, financed by a $60,195 loan, and when he traded in a 2014 Audi S8, receiving a $60,000 credit towards the purchase of a 2017 Mercedes Benz SUV, financed by a $123,590.12 loan that is being paid by VTG, Inc., the titleholder.

{¶ 35} The court determined that without Carol's knowledge, Douglas directed a change in revenue such that VTG, Inc. would receive revenue instead of VTG, LLC.  It found that Douglas entered into the consent order agreeing not to change the businesses'

15.

accounting policies or procedures and knowing that distributions to Carol were to be made by VTG, LLC. The court found that Douglas made this change to defeat Carol's interest in marital assets.

{¶ 36} The court determined that Douglas took excessive distributions in 2015 and 2016, totaling approximately $798,062, which he owes to VTG, LLC; that he executed promissory notes obligating VTG, LLC to pay VTG, Inc. for amounts loaned to make court-ordered distributions of $741,523 in 2017; and that under this scheme, his $798,062 obligation to VTG, LLC was reduced by $363,346 (his proportionate interest in VTG, LLC for payment to VTG, Inc.). The court found that Douglas acted in bad faith and took these actions to advance his personal financial interests by intentionally defeating Carol's interests.

{¶ 37} Finally, the court found that Douglas violated the consent entry by (1) increasing his 2017 salary from $120,000 to $200,000, (2) taking a $200,000 salary from Vendita, LLC in 2016 in addition to his salary from VTG, Inc.; and (3) establishing a corporate office and an apartment in Tampa, Florida in March 2017, with the intent to relocate the business.

### b. VTG, Inc.

{¶ 38} The court termed the second category of misconduct "VTG, Inc." It found that Douglas paid personal expenses totaling $55,559 for divorce-related fees and expenses through VTG, Inc., thereby reducing the net income of the business. It also

16.

found that Douglas took attorney fees of over $80,000 to pay for litigation against family members in Hardin County.

### c. Dissipation of Marital Assets

{¶ 39} The final category of misconduct identified by the court was Douglas's dissipation of marital assets. It found that Carol made a prima facie case of dissipation of marital assets insofar as Douglas spent marital funds in furtherance of an extramarital affair. Specifically, the court found that Douglas paid for trips for his girlfriend, allowed her to use VTG, LLC's debit card, wrote checks payable to her, and paid legal fees for her. It also found that Douglas committed financial misconduct by failing to pay property taxes on one of the parties' lake houses.

### 3. Douglas challenges the trial court's financial-misconduct finding.

{¶ 40} Douglas argues that the trial court's financial-misconduct finding is against the manifest weight of the evidence. He insists that the trial court made "broad generalizations about [Douglas's] conduct but did not support its findings," and he denies that he profited from his conduct or intentionally defeated Carol's distribution of the assets.

{¶ 41} Under R.C. 3105.171(E)(4), "[i]f a spouse has engaged in financial misconduct, including, but not limited to, the dissipation, destruction, concealment, nondisclosure, or fraudulent disposition of assets, the court may compensate the offended spouse with a distributive award or with a greater award of marital property." *Id.* The complaining party has the burden of proving financial misconduct. *Newcomer v.*

17.

*Newcomer*, 6th Dist. Lucas No. L-11-1183, 2013-Ohio-5627, ¶ 81.  "The trial court has discretion in determining whether a spouse committed financial misconduct, subject to a review of whether the determination is against the manifest weight of the evidence." *Boggs v. Boggs*, 5th Dist. Delaware No. 07 CAF 02 0014, 2008-Ohio-1411, ¶ 73.  We will not reverse a judgment as against the manifest weight of the evidence if it is supported by some competent, credible evidence.  *Blake Homes, Ltd. v. FirstEnergy Corp.*, 173 Ohio App.3d 230, 2007-Ohio-4606, 877 N.E.2d 1041, ¶ 62 (6th Dist.).

{¶ 42} Once financial misconduct is established, the trial court has discretion whether to make a compensating distributive award in favor of the offended spouse. *Boggs* at ¶ 73.  We review the trial court's decision for an abuse of that discretion.  *Id.*

{¶ 43} A finding of financial misconduct requires knowing wrongdoing, which may be inferred from the offending spouse's conduct.  *See Best v. Best*, 10th Dist. Franklin No. 11AP-239, 2011-Ohio-6668, ¶ 21.  Under R.C. 3105.171(E)(4), the misconduct usually must occur during the pendency of the divorce or immediately prior to filing for divorce.  *Orwick v. Orwick*, 7th Dist. Jefferson No. 04 JE 14, 2005-Ohio-5055, ¶ 28, citing *Rinehart v. Rinehart*, 4th Dist. No. 96 CA 10, 1998 Ohio App. LEXIS 2283 (May 18, 1998).

{¶ 44} Financial misconduct will typically involve profit to the offending spouse or intentional defeat of the other spouse's distribution of marital assets.  *Mikhail v. Mikhail*, 6th Dist. Lucas No. L-03-1195, 2005-Ohio-322, ¶ 28.  But "there are many forms of financial misconduct, and whether or not a party committed such misconduct is

18.

largely dependent on the specific facts of the case." *Orwick* at ¶ 30. As the trier of fact, the domestic relations court "is in the best position to evaluate evidence and assess the credibility of witnesses." *Harris v. Harris*, 6th Dist. Lucas No. L-02-1369, 2004-Ohio-683, ¶ 20. The court, therefore, is charged with determining "the credibility of each party's assertions in determining financial misconduct." *Tate v. Tate*, 5th Dist. Holmes No. 17CA004, 2018-Ohio-1244, ¶ 102. We generally defer to the trial court's credibility determinations. *Krohn v. Krohn*, 6th Dist. Wood No. WD-16-010, 2016-Ohio-8379, ¶ 25.

{¶ 45} We address Douglas's challenges to the trial court's financial-misconduct findings against the backdrop of the trial court's credibility determination adverse to Douglas and with the foregoing principles in mind.

### a. The purchase of vehicles.

{¶ 46} The court found that Douglas committed financial misconduct when he purchased a new Ford F-150 truck, financed by a $60,195 loan, and when he traded in a 2014 Audi S8, receiving a $60,000 credit towards the purchase of a 2017 Mercedes Benz SUV, financed by a $123,590.12 loan that is being paid by VTG, Inc. Douglas does not dispute that his conduct violated the court's orders; rather, he argues that he could not have been enriched by these purchases, and Carol did not establish harm, because he has no positive equity in the vehicles and actually lowered his monthly payments.

19.

**{¶ 47}** Carol maintains that with respect to the Ford F-150, Douglas was enjoined from incurring additional personal debt. With respect to the Mercedes, she emphasizes that Douglas traded in a valuable marital asset—the Audi—and used another marital asset—the business—to pay for that luxury vehicle. She insists that both the purchases and the trade-in violated the standard injunction and the consent order.

**{¶ 48}** We agree with Carol. Douglas depleted marital assets by disposing of marital property and incurring additional debt both personally and to the company, all of which constitute violations of the court's orders. We are not persuaded by Douglas's "no positive equity" argument; while it may be true that Douglas *currently* has no positive equity in the vehicles, this will change as he (and Vendita) continue to pay down the auto loans. And in any event, Douglas was enriched by his use of these high-end vehicles. We find that there was competent, credible evidence to support the trial court's finding of financial misconduct with respect to Douglas's purchase of the truck and the Mercedes SUV and his trade-in of the Audi.

*b. Revenue recognition*

**{¶ 49}** The court found that Douglas committed financial misconduct when he implemented a revenue-recognition change pursuant to which income would flow to VTG, Inc. instead of VTG, LLC—the entity from which distributions were to be made to Carol under the consent order. Douglas maintains that the decision to implement this revenue-recognition change was made in the fall of 2014—before he filed for divorce and before the consent order was entered—thus the change cannot constitute a violation of

20.

any order and cannot form the basis for a financial-misconduct finding. He insists that Carol should have reviewed the businesses' documents before negotiating these terms. He claims that he made repeated efforts to rectify the impact on Carol. And he argues that because the businesses were valued together as of December 31, 2015, there was no harm to Carol.

{¶ 50} First, despite Douglas's insistence that the change to revenue recognition had been planned before the divorce proceedings began, Carol testified that she was unaware of the change until late October of 2015. Douglas conceded at trial that the change was not fully implemented until 2015, and he offered no evidence—except for his own testimony—showing that this decision was made in 2014. The trial court explained in great detail at the outset of its judgment that it found Douglas not to be a credible witness. So while Douglas may claim that the revenue recognition change was determined in fall of 2014, the court was not bound to believe him.[4]

{¶ 51} Second, Douglas is not immune from a financial-misconduct finding based simply on the fact that some conduct took place before the complaint for divorce was filed. Ohio courts—including this court—recognize that conduct occurring before a party files for divorce can form the basis for a finding of financial-misconduct. *Mikhail*, 6th

---

[4] The companies' accountant confirmed at trial that he was first directed to make this change in procedure via an email dated February 18, 2015 (12 days after Douglas left the marital residence), and that this was a significant adjustment to the allocation of income and expenses between VTG, LLC and VTG, Inc.

Dist. Lucas No. L-03-1195, 2005-Ohio-322, at ¶ 29. In *Newman v. Newman*, 6th Dist. Lucas No. L-93-354, 1995 Ohio App. LEXIS 1188, *11 (Mar. 31, 1995), for instance, we affirmed the trial court's financial-misconduct finding where the husband wasted more than $80,000 in the two years before the complaint for divorce was filed, jeopardizing the couple's financial position. Similarly, in *Havrilla v. Havrilla*, 9th Dist. Summit No. 27064, 2014-Ohio-2747, ¶ 51, the appellate court found that the trial court abused its discretion in failing to find financial misconduct where the husband lost almost $7,000 gambling and set aside $13,000 for anticipated attorney fees approximately two weeks before filing for divorce. Thus, we reject Douglas's position that his pre-divorce conduct cannot form the basis for a financial-misconduct finding.

{¶ 52} Finally, Carol was the 51 percent owner of VTG, LLC, and the court's order required that distributions be paid to her from VTG, LLC—the entity that traditionally made distributions. Because of Douglas's decision to alter the revenue recognition procedures, VTG, LLC lacked the funds to pay these distributions, requiring it to borrow money from Douglas's wholly-owned company, VTG, Inc. Regardless of whether Douglas "profited" (and to be clear, it does appear that Douglas profited), he violated the court's order when he implemented the revenue-recognition change. Courts have made distributive awards for a spouse's financial misconduct even in the absence of a calculable "profit" to the offending spouse or "detriment" to the offended spouse. *See, e,g, Guagenti v. Guagenti*, 2017-Ohio-2706, 90 N.E.3d 297, ¶ 86-87 (3d Dist.) (penalizing husband for financial misconduct where husband repeatedly failed to make

22.

accurate, timely, and complete discovery disclosures and belatedly revealed existence of $1 million trust account, even though trust was ultimately found to be husband's separate property). *Galloway v. Khan*, 10th Dist. Franklin No. 06AP-140, 2006-Ohio-6637, ¶ 27 (recognizing that courts have affirmed findings of financial misconduct in cases where a party has violated a court's restraining orders). There was competent, credible evidence to support the trial court's financial-misconduct finding with respect to the change in revenue recognition.

### c. Excess distributions

{¶ 53} The court found that Douglas committed financial misconduct when he took excessive distributions totaling approximately $798,062 and executed promissory notes obligating VTG, LLC to pay VTG, Inc. for amounts loaned to make court-ordered distributions of $741,523 in 2017. It found that under Douglas's scheme, his $798,062 obligation to VTG, LLC was actually reduced by $363,346 (his proportionate interest in VTG, LLC for payment to VTG, Inc.).

{¶ 54} Douglas argues, again, that the revenue-recognition change took place before the divorce and that the businesses were valued collectively as of December 31, 2015, making actions after that date "irrelevant." He denies that he received "excess" distributions in 2015 or 2016. And he contends that Carol should have agreed to permit distributions from another source, such as their money market account, and that Carol was not damaged by the intercompany loans that led to the excess distributions.

23.

**{¶ 55}** Carol responds that Douglas's focus on the date the business was valued is misplaced because (1) Douglas took $446,066 in excessive distributions in 2015—before the business valuation date; and (2) the consent order required Douglas to maintain the status quo, which he violated by taking on debt and making distributions beyond those authorized by the consent order. She emphasizes that the companies' accountant confirmed that these excess distributions were made, and she maintains that under the consent order, she should have received 51 percent of any income distributed by the business, but instead received nothing. Finally, Carol insists that the parties were bound by the terms of the consent order, so we should reject any attempt by Douglas to deflect blame to Carol for refusing to agree to a solution contrary to what was approved by the consent order.

**{¶ 56}** Douglas's claim that he did not receive excess distributions is at odds with the testimony of the companies' accountant who confirmed that Douglas received excess distributions of $446,066.44 in 2015, and $351,996.21 in 2016. We reject Douglas's contention that his conduct should be excused due to Carol's refusal to agree to an arrangement outside what was established under the terms of the consent order. And regardless of the date of the business valuation, to the extent that Douglas's distributions exceeded what was permitted under the consent order, we cannot say that he did not profit or that Carol was not harmed. We find that the trial court's findings are supported by competent, credible evidence.

24.

*d. Increase in salary*

**{¶ 57}** The trial court found that Douglas engaged in financial misconduct when he increased his 2017 salary from $120,000 to $200,000 and took a $200,000 salary from Vendita, LLC in 2016, both in violation of the consent order. Douglas insists that he took no distributions and argues that he was entitled to receive $200,000 regardless of the source of that money. He claims, therefore, that he did not profit from this increased salary or cause detriment to Carol.

**{¶ 58}** Carol responds that Douglas's conduct was in direct violation of the consent order, he *did* take distributions—excess distributions, in fact—and he took an extra $200,000 salary from a newly-formed entity—Vendita, LLC.[5]

**{¶ 59}** The consent order was clear on this point—the parties' salaries were set at $120,000 per year, with total income capped at $200,000. Douglas's W-2s demonstrate that he violated this order. Douglas was not free to choose which of the court's orders he would abide by and which he would not. It is disingenuous for him to argue that he did not profit from his increased salary, particularly given the additional compensation he received from Vendita, LLC. There was competent, credible evidence to support the trial

---

[5] Joint exhibit No. 72, Douglas's W-2 from Vendita, LLC, reflects that in 2016, he received a salary of $170,000—not $200,000—and joint exhibit No. 71 reflects that he received a salary that year from VTG, Inc. of $113,832.50. The discrepancy between the numbers cited by the trial court and the numbers contained in the W-2s does not alter our analysis of this issue.

25.

court's financial-misconduct finding with respect to Douglas's decision to increase his salary beyond that allowed under the consent order.

### e. Move to Tampa

{¶ 60} The trial court found that Douglas engaged in financial misconduct when he established a corporate office and rented an apartment in Tampa, Florida in March 2017, with the intent to relocate the business. Douglas claims that the court could not attach any financial impact caused by the move because the company was valued as of December 31, 2015, and the move did not take place until 2017; the move was reasonable and necessitated by the industry; and Douglas was justified in taking all actions required to ensure that the business remained on secure financial footing.

{¶ 61} Carol responds that she maintained an interest in the company throughout the pendency of the litigation, but after Douglas turned VTG, LLC into a mere "shell" and moved operations to Florida, this was no longer a viable option. She maintains that Douglas's actions were intended to defeat the distribution of the marital assets to her.

{¶ 62} The consent order was clear: Douglas was to maintain the status quo with respect to the company's operations and he was not to relocate any asset of the company. Again, Douglas was not free to choose which parts of the consent order he would abide by. And the violation of a court order can form the basis for a financial misconduct award. We find that the trial court's finding is supported by competent, credible evidence.

26.

*f. Payment of fees through Vendita*

**{¶ 63}** The trial court found that Douglas engaged in financial misconduct when he used VTG, Inc. funds to pay fees and expenses relating to the divorce totaling $55,559, thereby reducing the net income of the business, and when he took attorney fees of over $80,000 to pay for litigation against family members in Hardin County.

**{¶ 64}** With respect to use of corporate funds to pay divorce expenses, Douglas argues that (1) "there is no indication that any of the attorney fees involved the divorce"; (2) it was appropriate to use corporate funds to pay fees based on the fact that the businesses were sued in the case and required representation; (3) his accountant testified that "a business valuation 'could be a business deduction since the business is the prime entity and that could be affected by the divorce'"; and (4) Carol suffered no damage as a result of the use of funds in 2016.

**{¶ 65}** First, contrary to Douglas's position in his brief, he conceded at trial that VTG, Inc. paid $39,740 to his divorce attorney for fees incurred in the divorce. Second, Douglas's divorce attorney did not represent the business, and it would have been a conflict of interest to do so, so we reject Douglas's contention that corporate funds were appropriately used to pay his attorneys. Third, Douglas conceded that the company paid $16,088 for the valuation in connection with his divorce; the business was appraised for purposes of determining the value of marital property—not for any legitimate business reason. Finally, regardless of when these payments were made, Douglas's conduct violated the consent order and he profited from this malfeasance.

27.

{¶ 66} We, therefore, conclude that the trial court's finding that Douglas inappropriately used corporate funds to pay litigation fees and expenses relating to the divorce is supported by competent, credible evidence.

{¶ 67} With respect to the Hardin County lawsuit, the court found that Douglas "took attorney fees in excess of $80,000 relating to this lawsuit * * *." A statement from Douglas's attorney, produced in response to a subpoena duces tecum, indicates that fees in excess of $107,000 were paid in connection with that lawsuit—some were paid by VTG, Inc. and some were paid by Douglas personally. Approximately $82,000 in fees were paid before the divorce, including a payment of $53,081.08, which was made by Douglas one month before he left the marital home. At trial, Douglas testified that he did not know the source of the funds he used to make this payment.

{¶ 68} Douglas insists that Carol was aware of and supported the litigation against his family. He emphasizes that most of the litigation took place before the divorce, and he argues that no itemized statements were provided to demonstrate that the fees he paid were expended in connection with that litigation.

{¶ 69} Carol, on the other hand, insists that she would not have been in favor of engaging in litigation against family members, and she claims that she was unaware of the fees Douglas had been paying.

{¶ 70} The court made clear that it believed Carol's testimony over Douglas's. The $82,000 in fees were paid from marital assets—whether they came from the business or from Douglas personally—in the 22 months before Douglas filed for divorce.

28.

Courts—including this court—have found that funds dissipated so close to the end of a marriage can constitute financial misconduct. *Newman,* 6th Dist. Lucas No. L-93-354, 1995 Ohio App. LEXIS 1188, at 11.

{¶ 71} We, therefore, conclude that there is competent, credible evidence to support the trial court's finding that Douglas engaged in financial misconduct by taking over $80,000 for fees and expenses relating to the Hardin County litigation.

g. *Dissipation of marital assets*

{¶ 72} The trial court found that Douglas engaged in financial misconduct when he dissipated marital assets in furtherance of an extramarital affair and failed to pay property taxes on one of the parties' lake houses. Douglas acknowledges that he spent approximately $50,000 on his girlfriend, but he maintains that the consent order set his income at $200,000, he was entitled to spend his personal money in any way he chose, and some of the money was spent in 2016 and 2017, after the December 31, 2015 business valuation date. He argues that there was no trial testimony to support Carol's claim that he failed to pay taxes on the lake home.

{¶ 73} Carol responds that while Douglas claims to have spent his personal salary on his girlfriend, the evidence shows that at least some of the payments to her came out of business funds. She maintains that it is of no matter whether funds were used before or after December 31, 2015, because the trial court permitted Douglas to maintain the day-to-day business operations of the company with the understanding that he would maintain the status quo. Instead, she argues, Douglas used the business to fund travel and

29.

entertainment with his girlfriend. Carol also claims that she received no payments required by the court's order from mid-October 2015, to July 2016, January through March 2017, and January through March 2018, allegedly because there were no funds available, but at the same time, Douglas was spending money on his girlfriend. Finally, she points out that the parties' accounts were valued as of the trial date, thus contradicting Douglas's contention that his use of personal funds means that Carol was not negatively impacted.

{¶ 74} As to amounts spent on Douglas's girlfriend, we begin by recognizing that the trial court found that the duration of the parties' marriage was through the date of the final hearing, thus Carol is correct that the court valued the parties' accounts as of the trial date. While the trial court did specify salaries and distributions that Douglas and Carol were to be paid, this did not entitle Douglas to expend exorbitant amounts of money on his girlfriend or allow her to use company credit cards. *Hoffman v. Hoffman*, 10th Dist. Franklin No. 94APF01-48, 1994 Ohio App. LEXIS 3536, *4 (Aug. 11, 1994) (affirming finding of financial misconduct where husband invested more than $44,000 in his paramour's company); *Winters v. Winters*, 6th Dist. Ottawa No. OT-09-025, 2010-Ohio-4269, ¶ 15 (affirming finding of financial misconduct where husband used marital funds of $1,500 to purchase Christmas gift for his girlfriend); *Hall v. Hall*, 2d Dist. Greene No. 2013 CA 15, 2013-Ohio-3758, ¶ 24 (affirming finding of financial misconduct where husband provided housing for himself and his girlfriend, while allowing the marital residence to go into foreclosure).

30.

{¶ 75} We also observe that while Douglas claims that he was permitted to spend his salary however he wanted to, he claimed in the trial court that Carol committed financial misconduct by paying for a $3,000 vacation for her boyfriend in 2017, while at the same time insisting that he may not be found to have committed financial misconduct by spending in excess of $50,000 on his girlfriend. We find his position disingenuous, and we conclude that the trial court's finding that Douglas engaged in financial misconduct when he spent over $50,000 on his girlfriend, thereby dissipating marital assets, is supported by competent, credible evidence.

{¶ 76} As to the taxes, when the Indiana lake house sold in April of 2017, information from the county treasurer shows that $3,029 remained outstanding for 2015 to 2016 taxes, and $6,202 for 2016 to 2017 taxes. Carol emphasizes that the consent order required Douglas to pay these taxes, and his failure to do so decreased the amount of the proceeds from the sale of the lake house.

{¶ 77} Douglas argues that trial exhibit No. 21 shows that Vendita Management paid a tax bill of $2,745.35 for the second installment of 2016. But exhibit No. 21 is simply a tax bill sent by the county treasurer—it does not demonstrate that Vendita Management paid this tax bill. Moreover, exhibit No. 18—the seller's statement, dated April 12, 2017—shows that taxes of $3,029.79 remained owing for 2015 to 2016, and $6,202.14 remained owing for 2016 to 2017.[6] "The failure of a party to pay taxes or file

---

[6] Douglas argues in his reply brief that "[i]t is commonplace for taxes to be prorated to the date of closing and that is not prima facie evidence that the taxes were not paid as

31.

a tax return is financial misconduct for purposes of R.C. 3105.171(E)." *Oliver v. Oliver*, 5th Dist. Tuscarawas No. 2012 AP 11 0067, 2013-Ohio-4389, ¶ 39, citing *Robbins v. Robbins*, 2d Dist. Clark No. 06CA0136, 2008-Ohio-495.

{¶ 78} We conclude that the trial court's finding with respect to the failure to pay property taxes on the lake house in violation of the consent order is supported by competent, credible evidence.

{¶ 79} In sum, we conclude that the trial court's financial-misconduct findings were supported by competent, credible evidence. We find Douglas's first assignment of error not well-taken.

### B. The Amount of the Award for Douglas's Financial Misconduct

{¶ 80} In his second and third assignments of error, Douglas contends that the trial court exceeded its authority when it granted a distributive award to Carol in an amount that bore "no relationship to the alleged misconduct or its financial impact."

{¶ 81} Where, as here, the trial court finds financial misconduct on the part of one spouse, it may in its discretion, award the offended spouse a greater share of marital assets. *See Garish v. Garish*, 10th Dist. Franklin No. 97APF06-813, 1998 Ohio App. LEXIS 931, *14-15 (Mar. 10, 1998). The amount to be awarded to an offended spouse is not stipulated by statute, and lies within the trial court's discretion. *Eberly v. Eberly*, 3d

---

they came due." The seller's statement shows that prorated taxes of $1,716.21 for January 1, 2017, to April 12, 2017, were debited to the seller. This is entirely separate from the past-due taxes.

Dist. No. 7-01-04, 2001 Ohio App. LEXIS 2606, *7 (June 13, 2001). The court may fashion an award to compensate the injured spouse in any amount it deems necessary. *Fisher v. Fisher*, 3d Dist. Putnam No. 12-96-13, 1997 Ohio App. LEXIS 3135, *27 (July 9, 1997). It need not apply a "rigid, mechanical approach" or undertake "a calculated dollar-for-dollar division." *Hoffman*, 10th Dist. Franklin No. 94APF01-48, 1994 Ohio App. LEXIS 3536, *8-11 (Aug. 11, 1994).

{¶ 82} Carol's exhibit No. 6P summarizes the profit to Douglas and detriment to Carol caused by Douglas's financial misconduct. Subtracting out the amounts for conduct that the trial court did not find to be wrongful, and using the numbers consistent with those acknowledged by the court, Carol estimates that Douglas's conduct resulted in profit to Douglas or detriment to her totaling over $1 million. The trial court awarded her only $500,000. We find no abuse of discretion in the trial court's decision to award Carol half the amount of the profit to Douglas or loss to Carol that resulted from Douglas's financial misconduct. *Taub v. Taub*, 10th Dist. Franklin No. 08AP-750, 2009-Ohio-2762, ¶ 35 (finding no error where trial court awarded half of sale proceeds to wife for husband's financial misconduct).

{¶ 83} We find Douglas's second and third assignments of error not well-taken.

### C. Failure to Find Financial Misconduct by Carol

{¶ 84} In his fourth assignment of error, Douglas contends that the trial court erred when it failed to find that Carol engaged in financial misconduct. Specifically, he argues that Carol (1) dropped Douglas from her health insurance in violation of the consent

33.

order prohibiting her from doing so; and (2) opened new joint accounts with their children during the pendency of the divorce, transferred money from existing joint accounts into those new accounts, then used money from the new accounts to pay expenses for the children that she herself was required to pay under the consent order.

{¶ 85} The trial court held that Carol did not personally profit from the alleged misconduct, and did not intentionally dissipate, destroy, conceal, or fraudulently dispose of marital assets. As already articulated, we review a trial court's finding of financial misconduct under an abuse-of-discretion standard.

{¶ 86} As to the issue of health insurance, Douglas is correct that the trial court's temporary orders required Carol to maintain health insurance for Douglas. But Carol testified that her employer, The University of Toledo, began to enforce a policy prohibiting its employees from maintaining health insurance for an otherwise eligible spouse who was employed and had insurance available through his or her employer. Douglas was employed by Vendita and Vendita offered health insurance to its employees, so Carol could no longer maintain insurance for Douglas. Carol indicated that she notified counsel of this change so that the information could be relayed to Douglas.

{¶ 87} As to amounts removed from the children's bank accounts, the trial court specifically found that Carol reimbursed a portion of those funds in 2016, and that there was no evidence that Carol dissipated marital assets or personally profited. Additionally, we observe that for the most part, the exhibits identified by Douglas show small

34.

purchases that appear typical for a teenager—Taco Bell, Tim Horton's, Chipotle, Starbucks, Chick-Fil-A—and this is consistent with the trial court's finding that the children sometimes withdrew funds to pay their own expenses.

{¶ 88} We will not reverse a judgment as against the manifest weight of the evidence if it is supported by some competent, credible evidence. *Blake Homes, Ltd.*, 173 Ohio App.3d 230, 2007-Ohio-4606, 877 N.E.2d 1041, at ¶ 62. We find that with respect to the trial court's rejection of Douglas's claim that Carol committed financial misconduct, there was competent, credible evidence in support of the trial court's judgment.

{¶ 89} We find Douglas's fourth assignment of error not well-taken.

### D. Failure to Distribute Carol's Credit Union Account

{¶ 90} In his fifth assignment of error, Douglas contends that the trial court abused its discretion by failing to distribute $68,379.79 that Carol held in a credit union account, instead finding that Carol needed these funds to support their children. He argues that Carol had received $667,416.86 for 2015 and 2016, and did not need to dissipate the funds in the credit union to pay their children's expenses.

{¶ 91} The trial court found that Douglas failed to make the first distribution owed to Carol under the consent order until October of 2015, and then failed to make additional payments under the order until July 31, 2016. During this same period, the parties' children were enrolled in Catholic high schools and Carol was responsible for their expenses. The trial court accepted Carol's testimony that the funds in her account were

35.

used to support her and the children and to pay the children's educational expenses. Particularly given the trial court's credibility determination in favor of Carol and against Douglas, we find no abuse of discretion.

{¶ 92} We find Douglas's fifth assignment of error not well-taken.

### E.  Spousal Support

{¶ 93} In his sixth assignment of error, Douglas contends that the trial court abused its discretion when it awarded monthly spousal support to Carol of $14,000.  He raises numerous challenges to the spousal-support award.  First, he argues that there was no basis for the amount of income that the trial court attributed to him.  Second, he claims that the trial court improperly "double-dipped" because it considered the company's future income stream in valuing the business for purposes of dividing it as a marital asset, then considered his half of the future income stream and his salary in setting spousal support.  Third, he contends that the trial court considered monthly expenses relating to their adult children in arriving at the spousal-support award.  Finally, he maintains that the trial court's order respecting spousal support must terminate upon his death because the trial court's judgment fails to expressly state otherwise.

{¶ 94} R.C. 3105.18(B) provides that "[i]n divorce and legal separation proceedings, upon the request of either party and after the court determines the division or disbursement of property under section 3105.171 of the Revised Code, the court of common pleas may award reasonable spousal support to either party."  R.C. 3105.18(C)(1) sets forth the factors that must be considered "in determining whether

36.

spousal support is appropriate and reasonable, and in determining the nature, amount, and terms of payment, and duration of spousal support." Those factors are:

(a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;

(b) The relative earning abilities of the parties;

(c) The ages and the physical, mental, and emotional conditions of the parties;

(d) The retirement benefits of the parties;

(e) The duration of the marriage;

(f) The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;

(g) The standard of living of the parties established during the marriage;

(h) The relative extent of education of the parties;

(i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;

(j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;

(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;

(l) The tax consequences, for each party, of an award of spousal support;

(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;

(n) Any other factor that the court expressly finds to be relevant and equitable.

**{¶ 95}** While the trial court is required to consider each of these statutory factors, it need not comment on each of them; "rather, the record must only show that the court considered the statutory factors when making its award." *Choi v. Choi*, 2018-Ohio-725, 106 N.E.3d 908, ¶ 9 (9th Dist.). An award of spousal support is generally within the trial court's discretion and will not be disturbed absent an abuse of that discretion. *Newcomer*, 6th Dist. Lucas No. L-11-1183, 2013-Ohio-5627, at ¶ 22.

*1. The court used Douglas's tax returns to determine his income.*

**{¶ 96}** The trial court began its analysis of Carol's request for spousal support by calculating Douglas's annual income. It observed that as the sole shareholder of VTG, Inc., Douglas's annual income includes W-2 wages and distributions reported as K-1 income—Douglas controls both amounts. Douglas also receives interest income. Taking

38.

into consideration these three sources as reported in Douglas's tax returns, the trial court calculated a three-year average of his income for the period 2014 through 2016; it ignored Douglas's 2012 and 2013 income, which was approximately $3 million and $1 million, respectively. It arrived at an average annual income of $970,000 per year by combining Douglas's average annual salary ($174,611), his average annual K-1 income ($763,333), and his average annual interest income ($6,806), then adding his $200,000 salary for 2017. The court noted that Douglas maintains a practice of running personal expenses through the business, thereby deflating distributions and profit income, but it did not purport to impute any additional income to Douglas for this perceived malfeasance.

{¶ 97} Douglas raises several challenges to the trial court's calculation of his income.

{¶ 98} First, Douglas claims that there was "no specific basis shown" to demonstrate that he received actual income from Vendita beyond his salary. The trial court relied on Douglas's K-1s and his tax returns in determining his income from distributions. We find no error in this approach, and we reject this argument.

{¶ 99} Second, Douglas claims that "the Trial Court completely failed to recognize the other assets to be transferred to [Carol]." It is clear from the trial court's detailed decision that it was well aware of the other assets that Carol would be receiving pursuant to the property distribution. We reject this argument as well.

39.

{¶ 100} Third, Douglas suggests that the trial court should have determined his income to be $400,000, the amount that both parties' experts testified would be reasonable compensation for his position. In *Rossi v. Rossi*, 8th Dist. Cuyahoga Nos. 100133 and 100144, 2014-Ohio-1832, for purposes of calculating spousal support, the trial court projected the husband's future income by taking an average of his salary and distributions for the previous five-year period. The husband argued that the trial court should have used the "reasonable market-rate officer compensation" testified to by the expert witnesses—an amount that was $240,000 less than the average calculated by the court. The appellate court rejected this suggestion, observing that there was no evidence that husband had ever received an annual salary in that amount. We reach the same conclusion here.

{¶ 101} Finally, Douglas insists that even if "pass-through" income was properly considered in calculating his average salary, the court still erred because his average income for 2014-2016 would have been $835,201 per year—not $970,000 per year. Douglas does not explain how he arrives at that figure. Having said this, it is not clear to us why the trial court *added* Douglas's $200,000 salary for 2017 to his three-year average income instead of merely using this figure to calculate his average salary based on a four-year average. Accordingly, we remand this issue to the trial court so that it can either explain why it added Douglas's 2017 salary or correct this aspect of its calculation and any effect it may have had on its spousal-support award.

40.

*2. The trial court did not impermissibly "double-dip."*

{¶ 102} Douglas next argues that the trial court impermissibly "double-dipped" because it considered the company's future income stream in valuing the company, then "used [Douglas's] half of the future income stream and his salary to set spousal support." In challenging the court's methodology, Douglas relies on the Tenth District's decision in *Heller v. Heller,* 10th Dist. Franklin No. 10AP-312, 2010-Ohio-6124.

{¶ 103} In *Heller,* the husband owned a 39.5 percent interest in a subchapter S corporation called H&S, from which he received bonuses or distributions and also drew a salary. The court adopted a value for the husband's interest in the business using an "income approach" that relied primarily on the future profits of the business. Using that number, it then awarded property of equal value to the wife in order to equalize the property distribution. But the court also awarded spousal support to the wife in a set amount *plus* an additional twenty percent of each bonus or shareholder distribution that the husband received from the company. The Tenth District held that this was error because the trial court "'double dipped' when it awarded [the wife] both one-half of the H&S asset and then another 20 percent of [the husband's] half in additional spousal support." *Id.* at ¶ 6.

{¶ 104} Douglas argues that the trial court here did the same thing when it calculated Vendita's value based on a future income stream methodology for purposes of determining a distributive award to Carol to equalize the division of assets, but then used

41.

his half of that future income stream in determining his ability to pay spousal support. There are a number of problems with Douglas's position.

{¶ 105} First, the Tenth District itself has observed that "almost immediately after [it] decided *Heller,* [it] began to soften its holding." *Gallo v. Gallo,* 10th Dist. Franklin No. 14AP-179, 2015-Ohio-982, ¶ 32. It made clear that its holding in *Heller* was fact-specific and that it had not promulgated a flat prohibition against double-dipping. *Heller* at ¶ 8. And the court emphasized that there are circumstances that override any unfairness that may arise from double-dipping and that the trial court ultimately has discretion "regarding if and how to remedy the double dip" that "turn upon the facts and circumstances of each particular case." *Gallo* at ¶ 34.

{¶ 106} Second, the Tenth District has recognized that the wisdom—and applicability—of its anti-double-dipping position in *Heller* has been questioned, particularly in cases like this one where "a spouse is a sole owner of a business who has complete control over the business's retained earning[s] to support the parties' lifestyle." *Settele v. Settele*, 2015-Ohio-3746, 42 N.E.3d 243, fn. 4 (10th Dist.), citing *Bohme v. Bohme,* 2d Dist. Montgomery No. 26021, 2015-Ohio-339. In *Bohme,* for example, the Second District expressly declined to follow *Heller* "because of the difficulty in the double-dipping analysis when dealing with [a] solely-owned, closely-held business evaluation as opposed to [a] defined-income-stream distribution." *Bohme* at ¶ 33. It concluded that to adopt an anti-double-dipping rule would lead to too much potential for disproportion. *Id.* at ¶ 30.

42.

{¶ 107} Finally, as Carol points out, we rejected a similar argument in *Kellam v. Bakewell,* 6th Dist. Erie No. E-13-032, 2014-Ohio-4635.  In *Kellam,* the marital asset at issue was the husband's law practice.  The husband argued that the trial court abused its discretion because contrary to *Heller,* it used the same income to both value his law firm and determine his spousal-support obligation.  We distinguished *Heller* on the basis that in that case, "the same *asset* was both *counted* in the marital division and *required to be paid* as part of the spousal support award."  (Emphasis added.)  *Id.* at ¶ 24.  In other words, we found it significant that the spousal-support award was fixed at a percentage of the distributions from the marital asset itself.  In *Kellam,* however, "the value of the law firm was determined in the marital division, but the spousal support award was based on [husband's] income in general."  *Id.*  Here, as in *Kellam,* Carol's spousal-support award was based on Douglas's income in general and not tied to the value of the business itself.

{¶ 108} Based on our analysis of the case law and the facts and circumstances of this case, we find no error in the trial court's decision to consider Vendita's future income stream to value the company for purposes of dividing the marital asset and Douglas's income earned from the business in calculating the spousal-support award.  We reject Douglas's double-dipping argument.

*3. The trial court's award did not consider expenses of the adult children.*

{¶ 109} Douglas claims that the trial court impermissibly considered the expenses of the adult children when arriving at a spousal-support award.  It does not appear to us that this is true.  The court observed that Carol *claimed* monthly living expenses of

43.

$44,895—which included the children's living and educational expenses, as well as insurance coverage—and that she *requested* spousal support of $25,000. But the court awarded her far less than either of these amounts. And, in fact, the court articulated its rationale for the amount it awarded:

> While the Court considered all statutory factors in determining a reasonable and necessary spousal support amount and the duration thereof, the Court was particularly influenced by the age and health of each party, that Wife sacrificed her career in part by raising the parties' children and assisting Husband in advancing his career, that Husband's ownership of the income producing business generates income clearly exceeding Wife's earning capacity, and the duration of the marriage.

**{¶ 110}** We find no merit to Douglas's claim that the trial court considered the adult children's expenses in determining the amount of spousal support.

   *4. The court ordered Douglas to maintain insurance in the amount of the award.*

**{¶ 111}** The trial court judgment indicates that "spousal support shall continue subject to earlier termination upon Wife's death, remarriage or cohabitation with another * * *." Douglas argues that the trial court erred when it failed to make the award of spousal support terminable upon *his* death. At the same time, Douglas also claims that because the court did not expressly state otherwise, the spousal-support obligation ceases upon his death.

44.

{¶ 112} Carol agrees that the judgment entry makes no express provision for continuing spousal support in the event of Douglas's death, but she observes that the trial court's order requires Douglas to maintain a ReliaStar insurance policy, designating Carol as the beneficiary, in an amount equal to the outstanding spousal support. It points out that Douglas assigned no error in the trial court's judgment requiring him to maintain this policy.

{¶ 113} R.C. 3105.18(B) provides that an award of spousal support "shall terminate upon the death of either party, unless the order containing the award expressly provides otherwise." In *Cogle v. Cogle*, 6th Dist. Wood No. WD-00-054, 2001 Ohio App. LEXIS 1501, *5-6 (Mar. 30, 2001), the trial court's order did not expressly state that the spousal-support obligation would not terminate upon the obligor's death. Nevertheless, the order required the obligor to maintain a life insurance policy large enough to cover any spousal support as yet unpaid, implying that the support obligation was to continue beyond the obligor's death. We remanded the case to the domestic relations court so that it could clarify whether it intended the spousal-support obligation to survive the obligor's death. Given the similarity between the facts in the present case and those in *Cogle,* we find that remand on this point is necessary.

{¶ 114} We find Douglas's sixth assignment of error well-taken, in part, and not well-taken, in part. We find that remand is necessary so that the trial court can either explain why it added Douglas's 2017 salary to its calculation of his average income for 2014-2016, or correct this error and any effect it had on its spousal-support award. We

45.

also remand for clarification with respect to whether it intended that Douglas's spousal-support obligation would survive Douglas's death. We affirm the spousal-support award in all other respects.

### F. Attorney Fees

{¶ 115} In his seventh assignment of error, Douglas contends that the trial court abused its discretion when it awarded Carol attorney fees of $87,500. He argues that "[t]he Trial court did not demonstrate the reasonableness of the fees and it did not show that the expenditures were necessary."[7]

{¶ 116} Douglas argues first that under R.C. 3105.18(H), Carol was not entitled to attorney's fees because she was never prevented from litigating her claims. Former R.C. 3105.18(H) provided that in determining whether to award attorney fees, the trial court must consider "whether either party will be prevented from fully litigating that party's rights and adequately protecting that party's interests if it does not award reasonable attorney's fees." As Carol points out, this provision of the statute no longer exists; rather, R.C. 3105.73(A) now provides authority for a trial court to award attorney fees.

{¶ 117} R.C. 3105.73(A) provides:

In an action for divorce * * *, a court may award all or part of reasonable attorney's fees and litigation expenses to either party if the court finds the award equitable. In determining whether an award is equitable,

---

[7] We note, of course, that *the trial court* does not bear the burden of demonstrating the reasonableness and necessity of fees.

46.

the court may consider the parties' marital assets and income, any award of temporary spousal support, the conduct of the parties, and any other relevant factors the court deems appropriate.

We review a trial court's decision to award attorney's fees under an abuse-of-discretion standard. *Newcomer*, 6th Dist. Lucas No. L-11-1183, 2013-Ohio-5627, at ¶ 88.

{¶ 118} In considering Carol's claim for attorney fees, the trial court recognized that Carol employed numerous attorneys over the life of this case and incurred fees and expenses totaling almost $480,000. At trial, Carol called an expert witness to testify as to the reasonableness and necessity of the attorney's fees she incurred, but with respect to most of her attorneys, Carol failed to provide the expert witness with invoices reflecting (1) the hourly rate, (2) the nature of services rendered, and (3) the amount of time expended in providing those services. The trial court denied Carol's request for fees where this information was lacking because Carol's expert conceded that without this information, he could not opine as to the reasonableness and necessity of the fees.

{¶ 119} The court found, however, that Carol provided expert testimony and detailed invoices to support fees totaling $107,926: $25,118 for services rendered by attorney Ralph DeNune and $82,808 for services rendered by trial counsel, Jay Feldstein. The court awarded Carol a portion of those fees after considering a number of factors, including: Douglas's refusal to sign the consent order; the disparity in income; the fact that Douglas used company funds to pay at least a portion of his attorney's fees and partial fees previously paid on Carol's behalf; Carol's retention of multiple attorneys

47.

resulting in duplication of efforts; the number of show cause motions filed by Carol; the fact that Douglas was found in contempt of court; the protracted and complex nature of the proceedings; and Douglas's abandonment of his parental alienation claim at the outset of a scheduled five-day trial.

{¶ 120} Douglas concedes that DeNune's fees of $28,115 are supported by the record, but he complains that the detailed invoices submitted as exhibits at trial support fees charged by Feldstein of only $26,686.50. Thus, he argues, the total fees supported by the record total only $54,801.50—not $107,926.

{¶ 121} Carol offered into evidence a payment register for the period of November 30, 2016, to May 31, 2017, for fees owed to Feldstein totaling $82,808.04 (exhibit No. 6N). But the only itemized statements admitted into evidence relating to Feldstein's services were trial exhibits Nos. 6O and 6P—invoices for services performed for the period of November 27, 2016, to February 24, 2017.[8] Those invoices total only $26,686.50. While Carol's expert testified that he reviewed "specific itemized invoices" from Feldstein for the period beginning in fall of 2016, up to June of 2017, detailed invoices for services rendered after February 24, 2017, were not admitted into evidence. Accordingly, we must conclude that the trial court abused its discretion when it awarded fees for services for which detailed invoices were not admitted into evidence. *See Gering v. Gering*, 8th Dist. Cuyahoga No. 43247, 1981 Ohio App. LEXIS 10475, *4 (June 25,

---

[8] Exhibit No. 12L is a duplicate of the invoice for November 27, 2016, to December 13, 2016.

48.

1981) (concluding that trial court abused discretion in awarding attorney fees where expert's testimony concerning reasonableness of those fees was based on materials never admitted into evidence as required by Evid.R. 703). Carol's award of attorney's fees must be reduced from $87,500 to $54,801.50.

{¶ 122} We find Douglas's seventh assignment of error well-taken, and we reduce Carol's attorney-fee award to $54,801.50.

### III. Conclusion

{¶ 123} We find Douglas's first assignment of error not well-taken. The trial court's financial-misconduct findings were supported by competent, credible evidence.

{¶ 124} We find Douglas's second and third assignments of error not well-taken. The trial court did not abuse its discretion in fashioning the award to Carol for Douglas's financial misconduct.

{¶ 125} We find Douglas's fourth assignment of error not well-taken. There was competent, credible evidence to support the trial court's rejection of Douglas's claim that Carol committed financial misconduct.

{¶ 126} We find Douglas's fifth assignment of error not well-taken. The trial court did not abuse its discretion in failing to distribute $68,379.79 that Carol held in a credit union account.

{¶ 127} We find Douglas's sixth assignment of error well-taken, in part, and not well-taken, in part. The trial court did not err when it considered Vendita's future income stream in valuing the business for purposes of dividing it as a marital asset and in

49.

considering Douglas's income earned from the business in setting the amount of spousal support. Additionally, the trial court did not consider the expenses of the parties' adult children in fashioning a spousal-support award. Nevertheless, we remand this case to the trial court so that the court can (1) explain its addition of Douglas's 2017 salary to his three-year average income or correct this calculation and any effect it may have had on the spousal-support award; and (2) clarify its intent in ordering Douglas to maintain a life insurance policy in the absence of express language indicating that the spousal-support obligation would survive his death.

{¶ 128} Finally, we find Douglas's seventh assignment of error well-taken. The itemized invoices for attorney's fees admitted into evidence total only $54,801.50. We, therefore, conclude that Carol's award of attorney fees must be reduced from $87,500 to $54,801.50.

{¶ 129} Accordingly, we affirm, in part, and reverse, in part, the March 23, 2018 judgment of the Lucas County Court of Common Pleas, Domestic Relations Division. Douglas and Carol are ordered to share in the costs of this appeal under App.R. 24.

Judgment affirmed, in part,
and reversed, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.                                       _____

JUDGE

Thomas J. Osowik, J.

_____

Christine E. Mayle, P.J.              JUDGE

CONCUR.

_____

JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.